Good morning, everyone. The first case on the call this morning is case number 121452, Dyke v. White, agenda number 8. Counsel, if you're ready, attorney, you may proceed. Good morning, Your Honors. Counsel, please report. I'm Christopher Turner, the assistant attorney general here on behalf of the defendant appellant, Illinois Secretary of State Jesse White. This court should reverse the appellate court opinion to the extent that it is adverse to the Secretary's final administrative decision that is on review. In that administrative decision, the Secretary found that the plaintiff, Richard Lee Van Dyke, had violated Section 12 of the Illinois Securities Law when he recommended and facilitated that his clients engage in replacement transactions, which they both sold and then purchased hybrid financial investment products called equity index annuities. Specifically, we ask that the court, first of all, find that these hybrid investment products, the equity index annuities, are securities under the Illinois Securities Law that I'll refer to as the Act in this argument. We also ask that the court reject the cross relief sought by the plaintiff, Van Dyke, and instead affirm the appellate court opinion to the extent that it held that the Secretary did not err by determining that Van Dyke had acted as an investment advisor under Section 12J of the Act when he recommended those challenged sales. We also ask that the court find that the record of evidence supported the Secretary's findings that Van Dyke had violated Section 12 of the Act, and particularly that he had breached his fiduciary duty that he owed under Section 12J by recommending sales to his clients that weren't in their best interests, weren't suitable for them, and worked a fraud to see them. Now, this appeal revolves around the sales of these hybrid investment products. We call them equity indexed annuities. Van Dyke refers to them as fixed indexed annuities. They're referred to as both. I'll refer to them as just indexed annuities here. But those names reflect the hybrid nature of these products. That is, they contain features both of a traditional annuity and of a security. Where does that fit exactly under the definition of security under Section 2.1? I mean, there's a list of many things, and I thought your focus initially was on face amount certificate, but maybe now it's on investment contract. I know, Your Honor, that it falls under the investment contract is what we argue. Van Dyke argues that it falls under the exclusion in the separate definition of face amount certificate. That is, a face amount certificate is one of the many listed financial products and transactions under the definition of a security. And the appellate court agreed with Van Dyke's reading of the Act that the exclusion from face amount certificate, that is for annuities that are issued by authorized insurance companies, that it's exclusion under that from the definition, the separate definition of face amount certificate, also excluded it from the definition of securities. However, it is Section 2.1, that definition of security, that determines whether or not any financial product is in fact a security under the Act. And that includes any of the listed financial transactions and products. All of them, including investment product, were separated by the disjunctive term, or. And as the appellate court recognized in the decision we cite, integrated research services, that use of the disjunctive or reflects the legislature's intent that each one of those financial products, each one of those listed transactions provides an independent basis for finding that it is a security under the Act. And here, these products, the index annuities, fall under investment contract. Now, this reading is consistent with the broad and flexible definition of both security and investment contract that was developed by the United States Supreme Court, and that this court, in its decision, Daly-Dindy Wiggins Oil Company, acknowledged that the legislature had adopted it to be applied under the Illinois Act. Mr. Turner, this, your argument on all issues, does it stop and start with this court finding that they are securities? No, Your Honor. That's also why we ask you to reject the plaintiff's argument that, for cross-belief, that he was not acting as an investment advisor under Section 12J of the Act. As we argued below, even if they do not, even if he doesn't, if these products are not securities under the Act, the Secretary still could proceed under Section 12J against Van Dyck because he acted as an investment advisor when he made the challenge. Well, the reason I ask on all issues, investment advisors defined as one peddling securities. So wouldn't that also hinge on us finding that this is a security? No, it wouldn't, Your Honor. The definition of an investment advisor does revolve around vice, which doesn't in some way refer to a security. However, the violation, actually, the anti-fraud provision at issue is 12J. And subdivisions of 12J, all of them use very expansive language and conspicuously do not use the term security in contrast to all the other provisions. Those other provisions of Section 12 that issue, Section 12A, 12G, 12I, those are all patterned on the Federal Securities Act. Both Section 12J and the definition of investment advisor under Section 2.11, they are both patterned on the federal definitions and the anti-fraud provisions in the Federal Investment Advisors Act. And those, as both the Securities and Exchange Commission has recognized and the federal courts recognized, those anti-fraud provisions in the administrative side of the Investment Advisors Act do not require that the violating conduct occurred in connection with the sale of a security. So our finding of whether or not it's a security only pertains to whether or not it comes under the Secretary's Department of Securities  if we do not find that they are securities, right? It does come, it comes under, if they're not, whether or not they're securities does decide whether or not you would find a violation of Sections 12A, G, H, and I, I think I've got them all there, of the Act, but it doesn't for 12J. Now, no matter what, we do acknowledge that these products, are regulated under the insurance code, under the insurance regime. We don't dispute that fact. That is consistent, actually, with also the federal system and its regulation of these products. And also, they're actually exempt under the Section 3 of our Act from any sort of registration requirements under the Securities Act. Help me understand that last piece. The language in the insurance code speaks about, notwithstanding any other provision of law, the Director has sole authority to regulate the issuance and sale of variable contracts. Correct, that is a provision in Article 14 and a half that relates to a separate product called variable annuities. That is another hybrid product, but it is a different, the variable contracts are not at issue in this case. That, that was a whole, Article 14 and a half was a, was a article created in a specific regulatory regime to oversee the maintenance of, the maintenance of the accounts involved with variable contracts. You don't have those kinds of accounts. Nobody argues that Article 14 and a half in any way would regulate index annuities or relates to index annuities. There is an argument, however, that it is argued, it is assumed that variable contracts are perhaps more risky than the type of annuities we have in front of us. And the intention of the legislature to bring them within the insurance code is an indication that these types of products are more like a variable contract and therefore would fall within the insurance code. Correct, Your Honor. They make that argument. However, that doesn't, all that would reflect then, regardless of whether or not the relative riskiness of an index annuity versus a variable annuity, the use of a very specific language both in that provision, 245.24, and in regulating that specific product in Article 14 and a half, reflect that the legislature's intent that it would only apply the plain language and both specifically that provision as it's interpreted in that broader article, it applies only to the variable contracts. Why that is a policy argument, why perhaps the legislature should also in the future decide to create a regime, like a similar regime under the insurance code to regulate index annuities and perhaps a similar type of preemption type provision, that's all that it reflects is that the legislature is specific and is explicit when it means to set out such a provision. Now, we also don't believe that that provision would apply anyway to the anti-fraud provisions of the Act, even with regard to variable contracts or if it applied to index annuities. So this idea, these index annuities, that language does not appear in either realm, either the Securities Act, and you're saying, and not in the Insurance Act as well. There might be a separate place where the insurance code, I'm not aware of it applying in the insurance code. It's nowhere in Article 14 and a half. I don't believe the index annuities fall anywhere within the insurance code. But they don't fall within the language of the Securities Act either. Well, they do as investment contracts, but you're right, I think you're asking if they don't explicitly refer to an index annuity or a variable annuity for that matter. They reflect generally to the only time it refers, I'm aware of that, to annuity is in the exclusion in the definition of face-to-mouth certificate in 2.14. Mr. Turner, can these annuities be subject to regulation both by the insurance code and the securities law? Yes, Your Honor, they can be, and we argue that they should be. And this is actually exactly what the United States Supreme Court and the federal appellate courts have recognized when they're applying the Federal Securities Act. And as I mentioned, that's what this court acknowledged, that the Illinois definition of securities is patterned on. That is, under that regime, when they looked first at variable annuities, it was the first one in the SEC versus variable annuity life insurance company, where we refer to it as the ballot case, had recognized that when they're looking at the exclusion in that, it was an exemption, actually, the way it works under the Federal Act. But very similar language saying that it would exempt any annuities that are issued by an authorized insurance company. That looking at whether or not those are actually, a specific product is exempt under that as an annuity, you look at whether or not it contains elements of investment risk such that it should be considered more of a security than as an annuity. But in doing so, it recognized that these products were already being regulated by all of the state systems, state insurance regulatory systems. However, despite that, it still found that the variable contracts that issued the variable annuities were securities. Now, this exact argument was made in the subsequent U.S. Supreme Court case, SEC versus United Benefit, which looked at a different product, another sort of variation called a flexible fund annuity, which was in some ways similar to a variable annuity, but also it provided guaranteed minimum returns as well of the original investment principle, which increased over time until it reached 100% return of the principle. But an argument that was made there was that these products were already being regulated under the state insurance regimes, therefore there was no need. But the U.S. Supreme Court explained that no, because it had elements of investment risk, because these things were designed to be sold based on the promise of potential future profits, they raised the types of considerations that are addressed by the securities laws and the Securities Act, as well as the kinds of considerations which might be raised by insurance products. Therefore, they should be subject to both regulatory regimes. And that is what we argue should be the case here as well. We don't dispute that they're subject to the Department of Insurance's regime, that it's perfectly both permissible under the insurance code, but also that these should be also regulated under the insurance code. So then it's not critical whether we define it as a security or not. Is that correct or am I wrong? Well, we think it's still important, we do, so that they are subject always, any transaction involving these products are always going to be subject to the anti-fraud provisions under Section 12 of our Act. In this case, because Van Dyck was acting as an investment advisor, the Department could still proceed against him under Section 12J, but in another transaction, perhaps, you wouldn't have someone acting as an investment advisor. There might not be a registered investment advisor at all like Van Dyck is. In that case, it would be very important that we define whether or not these products are securities, and so that they could be subject to the other provisions of Section 12. Thank you. Now, as we explained, these products, under the federal law, looking at similar hybrid products, the United States Supreme Court has already looked at and determined that the variable annuities, or even variable annuities that provided a guaranteed return, were still raised to kind of investment elements or considerations of investment risk, such that they should be subject to the securities regime. And then in subsequent federal appellate case that we studied, they even looked at products that were much closer to the indexed annuity and ultimately actually to indexed annuities like the ones here. In each of these cases, they found that the products raised the types of investment risk, considerations of investment risk, that would warrant subjecting them to the Securities Act, and particularly to the anti-fraud provisions. There was the Peorio Union Stockyards case that looked at a pension fund that gave a guaranteed return plus a pro bono share of an investment fund. The Court of the Seventh Circuit in that case decided that those were actually investment contracts that should be subject to the Act. In the Otto case, Otto versus Ballot, there was a fixed annuity, gave a 4%, I think, guaranteed return in that case, and then just gave a discretionary return. At the end of each annual term, the issuing company could provide a discretionary return on top of that. They said that unknown future discretionary return, again, raised these types of concerns of investment risk, and that when they're being sold and designed to be sold on that basis, that's the kind of considerations which should subject them to the securities regime. And finally, there was the American Equity Investment Life Insurance case, and that was where the D.C. Circuit ultimately decided that the index... It found that the Securities and Exchange Commission's new rule at that time clarifying that indexed annuities would be subject to the Federal Act, they found that it was a reasonable interpretation of the Federal Act. Now, as Van Dyck points out, that American Equities case did ultimately vacate that SEC rule, but it did so on a separate procedural ground. That is, under the Federal statute, the SEC was supposed to perform an economic analysis, and the Court just found that the economic analysis was insufficient, and vacated the rule and demanded that the SEC complete a sufficient economic analysis. But that's not at issue here. We don't have any kind of requirement that the Department engage in any kind of economic analysis. Rather, just like Federal law, to the extent that this Court were to find the Securities Act ambiguous on this matter, then it should defer to the agency that's charged with enforcing the Securities Act, and that is the Secretary of State and the Securities Department underneath it. Also, while that rule was then pending after the American Equity decision, the Dodd-Frank Act was passed, and in that Act there was an amendment where the amendment decided... basically effectively amended the Federal Act to exclude indexed annuities from Federal regulation. So these are not... the indexed annuities, at least if they meet certain criteria, are not regulated as securities anymore under the Federal Act. But that is based on the Congress' Act in 2010 with the Harkin Amendment to the Dodd-Frank Act. But that is not... the Securities Act, our Illinois Securities Act, is not based or patterned on the Dodd-Frank Act. If anything, that just reflects a change in the statute from the prior original Federal Securities Act, the one that our Act is patterned on. And that change is that they decided they should narrow securities so it no longer covers indexed annuities. But until the legislature takes action here, this Court should find that indexed annuities are securities subject to the Act. If we find that, or if we don't agree that these are securities, and you're asking us to come under... decide this under Section 12J, is our standard of review or the matters we consider different because the argument was that the decision of the Secretary was arbitrary, capricious, and against the manifest weight of the evidence, that there were no rules or regulations or expertise in the Department to give guidance on how people were to be prosecuted, that it depended on applied rules on an ad hoc basis? Well, the standard of review at that point, Your Honor, is under the manifest weight of evidence standard. The Appellate Court also did find that on the merits of the case, whether or not there was an actual violation of Section 12J, whether it was arbitrary and capricious. Now, we address each one of those arguments in our briefs. I mean, that would be the separate standard of review at that point. It's a fact-intensive review based on the facts of the case. And as I argued, we think the record supports the Secretary's findings of violations of the Act. Van Dyck also argues that the Department had engaged in improper rulemaking, but each of the arguments he makes address not just positions that the Department was making in the specific case against him. That's not rulemaking. So they said because the Department's witnesses did not count the and their expert witness did not count, for instance, the bonuses in valuing the products, that was based on the facts actually that were presented, that those bonuses would be eaten up by the higher annual fees. I see that my time is up, Your Honor. Thank you very much, and I will address any other issues on rebuttal. Okay, thank you. May it please the Court. Mr. Chief Justices of the Illinois Supreme Court Counsel. Your Honors, I'd like to get right to some of your questions. Is that your name? Eric Hart. William Hardy with Hinshaw & Culbertson, representing Mr. Van Dyck. I'd like to get right to some of your questions. This notion that these are investment contracts, that there's some kind of risk associated with this, that was never alleged anywhere in the notice of care. Investment contracts are not mentioned anywhere in this huge transcript and all of these exhibits. The Department of Securities has an investment contract regulation. That wasn't alleged. That was raised for the first time, as we note, in our reply reading, I think in our opening reading. After, it wasn't raised when we moved to dismiss, it wasn't raised during the hearing, it was raised in a footnote in the closing argument. No mention whatsoever of federal law. This is a post-hearing justification that was first raised, federal law, in the circuit court. There's no dispute about that. So this notion that these are somehow investment contracts is not supported by the record in any fashion whatsoever. This is an administrative hearing. If these are investment contracts, it should have been alleged. It should have been alleged the specific rules that were allegedly violated, the rules relating to investment contracts, should have been laid out. They weren't laid out. The argument always was, when we moved to dismiss, that these are facing out certificates, but the department had this theory that, well, they don't have to be registered, but we still have jurisdiction over them. And I never have quite understood the argument that they're making on that. But the law in Illinois is crystal clear on this. And, Justice Tice, you made an excellent point when you pointed out that variable annuities are excluded specifically under Illinois law. Variable annuities are, as the appellate court noted, very much more risky than these types of annuities. And also, there is nothing, no evidence whatsoever, in the Securities Act saying that these are, indexed annuities, are securities. There are no rules. Mr. Hardy, regardless of when federal law came into this case, would you agree that federal law would probably consider this a security? No, I disagree vehemently with that argument. I disagree with that, Justice Thomas, because under 77A, these types of annuities have always been exempt under federal law, fixed-indexed annuities, equity-indexed annuities, annuities that contain a guaranteed minimum. Okay, there's a guaranteed minimum. They can't lose their principle. All right? This is not like a variable annuity where the ‑‑ don't they seem to consider it a security if there's considerable investment risk? I think that's primarily with variable annuities. And, you know, we point out in our opening brief that federal law is, in essence, the opposite of what the department is claiming here. Federal law has always said that with these types of annuities, indexed annuities that are governed by insurance departments that are regulated by insurance departments are not considered securities under the Act. Now, there are a few older cases, Supreme Court cases, that dealt with those variable annuities. They're correct. That's not what we're talking about here. But I think that the fact that the state of Illinois expressly excludes or doesn't exclude, expressly states that the Department of Insurance has sole jurisdiction over variable annuities further bolsters, as the appellate court found, the finding that all annuities in the state of Illinois are under the exclusive jurisdiction of the Department of Insurance. It's the only logical result when you look at the regulations. The regulations, as we point out in our brief, are very detailed. They govern every aspect of these types of annuities. One thing that's completely missing from the argument here is a reference to any rule, any rule by the securities department that applies to these annuities. Is the Illinois Act fairly similar to the Federal Act? Not at all. The Illinois Act, well, 12J is quite different. 12J says when acting as an investment advisor, and then it lists the fraudulent conduct that you can't engage in. The Illinois Advisors Act doesn't include that language when acting as an investment advisor. It just prohibits any investment advisor from engaging in those actions. So Illinois specifically narrowed that when it adopted Section 12J. I don't know, I don't think, to the extent it was patterned after it, they didn't adopt it as it was drafted. They added that specific language. And as you pointed out, Justice Thomas, in your questions, that's very important because you have to be acting as an investment advisor under 12J. And we're talking about a 20-month period here, 20-month period. And during that 20-month period, we're dealing only with insurance annuities that are replacing other insurance annuities. Not this other situation that they've thrown out there in their brief, 2006, 2007, when some of these individuals had investment advisor agreements with Mr. Van Dyke. There's one, the Klee case, which, but there's no evidence in this case that he was acting pursuant to that. That was entered into a year before. So 12J is substantially narrower than the federal statute. And we point that out in our certified brief. We lay out the actual language. In fact, I quoted the entire statutes because I wanted the court to see just how different it is. And that modification is extremely important. Now, if 12J applies to this, you'd have to determine that he was acting as an investment advisor when he sold these annuities. Well, if these annuities are not securities, then 12J cannot apply, period. And getting back to the point that I started to make, there's one rule that they allege was violated, 130.853. Now, the appellate court ruled that doesn't apply. We made an extensive argument in our briefs to the appellate court why it doesn't apply. They don't dispute that. They don't dispute that they have no rules whatsoever. So what they did in this case is they introduced testimony from a couple of people from the insurance department, one in specific, Susan Lamb, who was asked, what are your suitability requirements for these types of annuities? And she said, you have to look at individualized analysis. You have to look at the specific individual concerns, needs, age, financial situation. There's a long list in the regulations of what you have to look at. Now, the department never conducted that analysis. There's no dispute about that. But I want to make one point in their reply brief. In their reply brief, they say, oh, it doesn't matter because, well, the old annuities, the ING annuities, we don't dispute that they would have earned the same amount of money on those ING annuities. There's no evidence of that anywhere in the testimony. They presented no evidence whatsoever about that. These are different products. They have different index strategies. They have death benefits that didn't exist under the old annuities. They have different rider options. They're completely different insurance products. And the notion that we can just have an expert come in from Virginia, who's not a securities expert, he admitted that. He's not an insurance expert. He has a degree in electrical engineering. He has a master's in business, and he has a Ph.D. in finance. But he admitted he's not a securities expert. He's not an insurance expert. What he did was he looked at 12 pages of documents, about a dozen pages of documents, just the surrender charges, and these spreadsheets that were prepared by the department's witness at the instruction of the prosecutor. No rules or regulations that deal with all those different categories on there. No individualized analysis whatsoever. He added all this up, and he said, oh, the average annuitant would have made more if they'd have kept the old ING policy. And he bases that on assumptions. Well, as we pointed out, in these documents, you've got thousands of pages of documents that were admitted. With very few exceptions, they're all insurance documents. They're insurance applications. They're insurance policies. They're acknowledgements where these individuals acknowledge exactly what these – that they're aware of the features of these annuities. They're aware of the surrender fees. They're aware of the MBA, the market value adjustment, which is very important in this case because in most of these cases, the market value adjustment – I don't care if you call it an offset or a contract feature or what you call it – it completely wiped out the surrender charge. So they ended up with more money. And then they invested – they purchased these other annuity contracts, which were better for their individual needs. And that's the other problem I have in this case. I've been practicing law for 30 years, probably, and I have never been involved in a case where you have 21 people who were allegedly defrauded. Fourteen of them testified, and they're all happy with Mr. Denheimer. They don't have any problems whatsoever with him. They didn't make up any complaints. They didn't claim to be defrauded or misled. Most of them – almost all of them, in fact – we lay it out in our brief, testified. We were very happy with him. He's a nice man. He explained everything to us. We went home, and we talked about this, husband and wife, before we made the decision. We made the decision to surrender these annuities and purchase these other insurance annuities. What is this big brother watching over these people and saying, we think this is fraud even though you're happy with these annuities? And these average annuity projections, we lay out in some detail what the actual figures are. They made a lot more money under these index strategies because of the very reason that they entered into these new contracts, these better contracts for their individual needs. They are very happy with these contracts, and the figures don't bear any relationship whatsoever to this average, strict economic analysis, they called it, which is not in any rule or any regulation. And how can we have aggregate fraud? We're talking about individuals here, individuals who all testify here. You know, this is not a case where any of these individuals complained. This was a complaint, as I understand it, by one of the Clee's children, who it's not absolutely clear from the record, but it appears from the record, if you read between the lines, that they were upset because Mr. Clee remarried, then made his new wife the beneficiary under these annuities. So the department went into his place of business. They started out with all of his security files. They couldn't find anything wrong with his security files, not a thing. So then they proceeded to subpoena all of his insurance files, every one of them. And over a 20-month period, they picked out the ones where there were surrenders and replacements. And they added up all of the surrender fees and the bonus recapture fees, and they came up with these spreadsheets, which bear no relationship whatsoever, any rule or regulation. Mr. Hardy, on a factual matter, so you're saying they made money after losing like the $297,000 in fees and $183,000 in commissions on one sale and $177,000 on another, they made money? They didn't lose money on commissions. These are commissions. There are two sets of commissions here. He got commissions when he sold the original annuities, okay? They don't claim that there's any problem with those. Their claim is actually, well, they should have kept those annuities. They never should have surrendered them. He didn't make any commissions when the annuities were surrendered. He made commissions when he sold the new annuities, and I can't remember what that is, $160,000 or $190,000. But that's over a 20-month period. You know, I don't know what my insurance agent makes. There are no rules or regulations that require him to disclose his commissions on insurance annuities. That's all governed by the Department of Insurance. The Securities Department doesn't have any rules. What they say is under 12J there's some kind of a fiduciary obligation, but there are no rules or regulations, fiduciary rules that say you have to disclose your commissions on annuity products like this. There's nothing like that. And, you know, the one case that they cite, this Perez case, where there were fiduciary obligations, that was a six-year process, a six-year process where the Department of Labor, the Federal Department of Labor, enacted these fiduciary rules that applied to insurance producers who market certain annuities to 401K plans and other ERISA plans. It was an extensive process. It wasn't some rulemaking thing that was made up during an enforcement proceeding. That's what happened here. I mean, it is – how much time do I have left? Three minutes. So, I mean, that kind of goes to the arbitrary of your priest's nature. As for the legal issues, federal law doesn't apply. To the extent federal law does apply, these fixed-index annuities have never been considered under the regulation of the state securities department. There are cases that would allow them to argue that variable annuities are going to apply. But, you know, as I say, in Illinois, every type of annuity is excluded. So, and I want to get to – we've talked about 12J, but I want to talk about attorney's fees just a little bit because that's in our cross-relation. I point out that basically they made up the rules. They didn't. They have no rules. This 853 doesn't apply. They now admit that. So, they have no rules. So, what do they do? They hire an expert who makes up the rules. They tell the auditor, who has no insurance or securities expertise, to exclude the bonuses, to do the spreadsheets in this certain way, because the department doesn't recognize the bonus as a reason for switching annuities. Well, you know, where is that in any rule or regulation? It's not there. It is a made-up rule. And as I distinguished some of the cases that they cite in their brief and the server block brief, but those are policies. Those are policies that they enacted. And what happened in this case to this man should never happen to anyone. He had 125 insurance clients.  His insurance business is gone. You've heard of Dick Van Dyke and Clients World. He sold that 15, 20 years ago. He educated himself. He became an insurance producer. He became an investment advisor. The Department of Security comes in and destroys that, literally, with no rules, no regulations. The Department of Insurance has no problem with it. There were some forms that weren't filled out properly. He reached an agreement with the Department of Insurance. He paid $6,000. That was the end of it. The Securities Department wants to fine him $330,000, plus $23,500 for this expert who had no expertise and made up rules from Virginia. It was nothing about Illinois law. Where is that money going? It's not going to compensate these people who were allegedly defrauded. They could have done that. They could have brought a forfeiture action. It is going to go into their enforcement to fund similar proceedings like this. The Department of Insurance has comprehensive regulations this court should affirm with respect to the appellate court's rulings, but also remand for purposes of a fine that 12J does not apply. He wasn't acting as an investment advisor. I'm not asking this court to award attorney's fees, but it ought to be remanded so the court can consider whether that's appropriate. Mr. Hardy, answer one question for me. Are these equity index annuities investment contracts? No. Okay. Thank you. They're not investment contracts. If they were, it would have had to have been alleged. And I could point you to the regulations, but it wasn't alleged. The regulation talks about when you're putting your principal at risk, the principal's not at risk here. And, I mean, if they were, it would have to be defined through rulemaking, not through some post-hearing analysis, which is what happened here. Thank you. Thank you, Your Honor. Thank you. Your Honors, first of all, just to address the question, just to correct something, there's nothing I know of in the definitions of investment contract or security that relates to a return of the principal. The definition of investment contract is that any type of financial product or transaction that's offered, that is where the person invests money in a common enterprise based on the expectation of possible profits from the efforts either of the issuer or the promoter or any other third party. And here you've got the contracts that are being offered based on the common enterprise, based on the contracts themselves, based on the promise of future profits by the efforts of others, being the stock indexes. With regard to counsel's arguments about the regulations, the insurance code does have regulations that generally cover annuity transactions, and the Department of Insurance applies those to index annuities. I'm not aware of any of those regulations that are specific to indexed annuities. They just apply generally to annuities and annuity transactions. The Securities Department doesn't have specific regulations based on index annuities or similar products, and there's nothing about that that's contrary to Illinois law. The courts have recognized repeatedly that administrative agencies generally can develop their standards through enforcement actions as well as through rulemaking. This is particularly important in cases both of fraud and securities fraud, because as this court recognized in the Daliadin decision when it laid out the definition of securities, it's a broad and flexible definition because we don't know what the new and variable types of schemes and products that people are going to come on in order to convince people to invest their money. So every time a new product comes out, the department's not required to issue a new rule about that product. Instead, it will apply enforcement actions against the products when there is fraud, when it believes that those products constitute securities under the Act. Your brief indicates that BANDAC earned 183,000 commissions from sales of the original EIAs and 177,000 commissions from the replacement, plus some other penalties. Does the record show whether the customers, the clients, lost this amount of money or whether they gained? Mr. Hardy seemed to indicate that the net to the individual was better than where they were before they made the exchange. We believe that under the facts that they ended up being worse off with those cases. But the commissions didn't. Mr. Hardy is correct. The commissions came, I believe, from the issuing companies. The commissions are important both because they reflect what would be BANDAC's motivation for recommending the replacement transaction. So the companies paid the commissions, not the customers. As far as I'm aware, yes, correct. And the investment amount was simply transferred from one type of investment to another, same face value, same guarantees? Well, no, it weren't. They were both equity indexed. They were both indexed annuities. But the first product, you would suffer for it. On the one hand, you would, depending on the product, make an adjustment based on what the current interest rates were. But all of them suffered surrender charges and penalties. So all of them have less value now than they had before? Does the records show that? Well, what he is arguing is that for some of them, but not all of them, that the value adjustment would inflate the value of the original annuity so that, in BANDAC's opinion, it would make more money than after the surrender charges. However, all of them did suffer a loss of those surrender charges still. All of them, except for one, had higher annual fees that would then take away money on an ongoing basis in greater amounts than the original annuities. Also, on the downside, the new annuities had lower guaranteed minimums. So in this case, the time we're looking at is during the bull market. So the products did rather well with the bull market. They participated to some extent in whatever index annuities. But that was true of the original annuities as well. That's clear in the record. There's no doubt about that. So, again, does the record show that these customers or clients are worse off financially than they were before the exchange? Does the record show that? We believe that it does because of Dr. O'Neill's financial experts' analysis showed that they would lose more money on a going-forward basis. Now, some of them – They didn't lose. They haven't lost. Well, many of them did lose it, but also their accounts, the specific accounts he compared both of the original and would be the replacement annuity for each year going 25 years forward. Some of them, with the higher market value adjustments to them, would have, after about 10 years or longer, the accounts would switch over and the replacements would be worth more in the future. But then he applied analysis where he corrected for the time value of money and also for the age. All of the clients bought these replacement annuities between the ages of 61 and 82. He testified it was a standard actuarial analysis that, at a certain point when you won't be able to use that money, that it will have, over time, less value to you. So he found that the present-day value of all the annuities, original annuities, would be higher than the replacement annuities. So we did put in the evidence. We do believe they all were worse off financially. Following up on Justice Carmeier's question, though, it sounds like it's all speculation. Do you have any facts that the clients actually lost money today? We don't have facts showing about what the – with the way that the – sorry, the – Each one of the clients – We don't know how each of the products would have computed the specific changes in the indexes for each of them. So we don't know that information? That information we don't, but we do know they lost still money because the analysis they applied, they still lost these surrender charges. They still – and the loss of those surrender charges over time would still affect the value of any of the products as compared to the original annuities. But they were counseled in that, knowing that they would lose – that surrender charges would take place, perhaps. Perhaps, but again, that was only a vague – We just don't know. So we don't – yes, through that we don't know. But we do know that they did – that these were in their best interest, we have several of them who have testified they weren't aware about the annual fees or don't recall about the annual fees which were hired, which were going on an ongoing basis. Well, wasn't it important to know before a fraud action is commenced against an individual? The expert was probably hired down the line somewhere, right, to come up – and even that requires extrapolation to come up with a figure that says they're actually better or worse off. I mean, isn't that important? How do you make a decision to say you can't make it based on the commissions, right, regardless of them being substantial, they're not paid by the clients, as long as – I don't think any client would care if you pay a million – if the insurance company pays a million dollars commission if they're going to make more money. So when is the decision made to pursue, you know, like a 12-J action? Well, the 12-J action provides – you know, it's imposing fiduciary duty, which is based actually – it is, just so we're clear, it's based on the Investment Advisors Act and the application of that of what 12-Js patterned on 206. We didn't rely on the Paris case, by the way. We relied on the Supreme Court case, this capital gains research case, which recognized that under 206 it does impose fiduciary duty. And getting directly more to your question, though, they made the decision based on when they looked at the analysis of the replacement transactions. They saw the substantial charges that were being imposed under all of the products. They saw that the fees had changed so that now that they were having to – sorry, they were now being subject to higher annual fees on a forward-going basis and they had lower minimums. So they saw at that point, the department saw that for each of these transactions, that they had suffered a loss. So it was more based on the fact that if the other annuities were still in place, they wouldn't have incurred the fees and they would still have the benefit of the bull market? Correct, Your Honor. Don't insurance companies – you're subject to getting higher fees every time you change your insurance policy as well. I mean, that's expected, isn't it? I can't speak for any kind of insurance, but annuities – what is common with annuities is you'll always be subject to some sort of surrender charges. You'll lose money. But you said that the department looked at the fees. I'm sorry, Your Honor. You said the department looked at the fees were increased, and that's what I was asking about the fees. No, Your Honor. We don't know in any kind of – you will always have annual fees. I mean, this – you don't know if the fees will be on the next product. In this situation, the fees were higher in the replacement products. That probably also was a product of the changing interest rate. I mean, it could have been environment, which made the older – the original annuities, actually their guaranteed minimums were more valuable at that point because you had lower interest rates. So those interest rates then become higher value. I see my time is out, Your Honor. We ask – unless you have any more questions, we ask on all the arguments we made in our opening briefing reply brief that you reverse the appellate court decision to the extent that it was adverse to the Secretary's final administrative decision and affirm that that final administrative decision in its entirety. Thank you. Thank you. Case number 121452, Van Dyck v. White. F.L. will be taking that advisement as agenda. Number 8, Mr. Turner. Mr. Hardy, we thank you for your arguments today, and you are excused for their effects.